SYDNEY GREGG, BY N. B. CRAIG HER COMMITTEE, PLAINTIFF IN ERROR V. THE LESSEE OF GABRIEL SAYRE AND WIFE.

This case was submitted to the court upon printed argu-

ments, by Mr Watts for the plaintiff, in error, and Mr Fetterman for the defendants.

Mr Justice M'LEAN delivered the opinion of the Court.

An action of ejectment was originally commenced, between the above parties in the district court, which possesses circuit court powers, for the western district of Pennsylvania, and a judgment was obtained by Sayre and wife, to recover possession of certain lots of land within the original manor of Pittsburgh. To reverse this judgment, a writ of error was prosecuted, which brings the case before this court.

On the trial in the district court, a bill of exceptions was taken, out of which arise certain points that are now to be considered and decided. The bill of exceptions reads in part, as follows. "And the counsel for the plaintiffs, to maintain and prove the issue, gave in evidence, among other matters, a deed from John Penn, Jun. and John Penn to Nathaniel Bedford, dated the 31st day of May 1786, for sixty-two acres of land on the Monongahela river, in the manor of Pittsburgh, being acknowledged on the 1st day of June 1786, in the city of Philadelphia, and duly recorded, &c.; also an assignment, indorsed upon said deed, of all the right, title, claim and interest of the said Nathaniel Bedford to the premises, to Mrs Jane Ormsby, dated the 1st day of June 1786, and duly acknowledged, &c.; also a certificate of the recorder of the county of Washington, dated the 15th of October 1831, that there is

no record of the transfer of the title to the premises aforesaid, by said N. Bedford to Mrs Jane Ormsby, in the office of Washington county. It was then admitted, by the attorneys for the parties, that the children of John and Jane Ormsby were: Mrs Bedford, who died on the 8th of July 1790, without issue; John Ormsby, Jun., who died in August 1795; Joseph B. Ormsby, who died on the 20th of December 1803; Oliver Ormsby, who died in the year 1832; and the present defendant, Mrs Sidney Gregg, who is the only survivor, and under the providence of God a lunatic.

It was further admitted, that Mrs Jane Ormsby, the wife of John Ormsby, died intestate, on the 13th day of June 1799, and that her husband, John Ormsby, died on the 19th day of December 1805."

The possession of Mrs Gregg, of the twenty-five acres, and of the eight acres and one hundred and twenty-two perches, the upper part of the sixty-two acre tract, was then admitted by the counsel for the defendants.

The plaintiffs further offered in evidence, a petition to the orphan's court of the county of Allegheny, signed by O. Ormsby and N. B. Craig, the committee of Mrs Sidney Gregg, and filed in November term 1828.

Among other evidence, the counsel for the defendants proved, by the testimony of John Hutchinson, that he had known the family of Mr Ormsby for forty years, and lived as a tenant under the old gentleman and his son Oliver Ormsby, about thirty-five years, and sometimes in their families, before old John Ormsby's death. Isaac Gregg, his son-in-law, as early as 1799, employed hands to clear out the piece of property where the ferry house now stands; the part next the hill being cleared, and the part next the river being in woods. That the said Gregg employed his brother and himself, who cut off the timber into cord wood; that Mr Gregg was cautious in showing them the lines marked by a post on the bank, and a butterwood tree blazed, four or five rods above the run that falls into the river, that we should not cut the timber below it, as the land belonged to Mr Ormsby; that in the year 1800, Mr Gregg employed them to go up the hill, and to cut timber to build a house and four fences; and in the autumn

of 1800, the house was put up by them, and that he paid them seventy-five or eighty dollars for doing it."

"Mr Gregg put Alexander Gibson as a tenant in the house, who occupied it that fall and the succeeding winter, and made an agreement with Mr Gregg, to rent it for several years, but afterwards abandoned it."

"Samuel Emmet went into the house in the spring of 1801, and occupied it for a great number of years. George Kintzer was in it for many years after Emmet. Andrew Rearick was there; and Young lived in it a year; George Bonners for six months; Jacob Drake for three years. These tenants were all put in by Isaac Gregg and his family. Witness also stated, that he recollected that Isaac Gregg got another lot adjoining the twenty-five acre lot, and between it and the bridge, about twenty-nine years ago. Mr Gregg was to allow John Tate, his tenant, out of the rent, for putting up a barn, and witness assisted him, &c. On the twenty-five acre lot, there was the ferry house, a stable and a large shed: these improvements were all made by Mr Gregg. The fences were put round the upper lot in 1800; the lower lot was fenced long before. The fences, since that time, have been kept up, and the witness never understood, that any one, except Mr Gregg, had any claim to the lots. Witness refers to the two lots in controversy."

"James Ross, Esq. testified, among other things, that he was acquainted with John Ormsby's family in 1782. In 1784, Colonel Woods, as the agent of the Penns, surveyed the sixty-two acres in controversy, and noted, in his draft, that the tract was platted for John Ormsby. After the reservation of this lot, from Mr Ormsby, the manor was subdivided. Mr Woods and Mr Brackenridge, who were the counsel for Mr Ormsby, recommended that the deed should be taken out in the name of Mrs Ormsby; and Doctor Bedford, her son-in-law, proceeded to Philadelphia for that purpose, and brought back the title; the consideration money had, probably, been accumulated by Mrs Ormsby. Isaac Gregg was in possession of the property before the dates of the deeds to him. In 1802, Mr Gregg had the ferry, and he and his tenants have held possession ever since.

"Other witnesses were examined, who corroborated the facts

already stated. Defendants also produced, and read in evidence, two deeds; the first from John Ormsby, Jun., to Isaac and Sidney Gregg, dated the 24th day of November 1804, which had been duly acknowledged and recorded, for twenty-five acres of the land in dispute; and also a deed from the same to Sidney Gregg, dated the 13th of April 1805, for eight acres and one hundred and twenty-two perches. Several leases of the tenants of Isaac Gregg and his family were read, and proof was made of the payment of taxes on the lots. The defendants also read in evidence, the will of Joseph B. Ormsby, and reference was made to an action of partition, instituted by the plaintiffs against the defendants, in which a judgment had been rendered in favour of defendants; to reverse which judgment, a writ of error was brought, and was still pending in the supreme court of Pennsylvania."

The plaintiffs' counsel then proved, by the testimony of Samuel Pettigrew, Esq., that he was one of the viewers appointed by the orphan's court, under the petition of the 23d of December 1832, before referred to; that the viewers went on the ground, and allotted a portion of the upper part of the tract to Mrs Gregg, and the lower part to Mrs Ormsby.

The counsel for the defendants then offered to prove, by the testimony of H. M. Watts, who was attorney for Mr Ormsby, and presented the petition above referred to, that it was done at the instance of Mr Ormsby, for the purpose of establishing his title to the lower part of the tract; that at the time said petition was signed, it was done reluctantly by Mr N. B. Craig, as the committee of Mrs Gregg, and understood that Mrs Gregg had heretofore claimed the portion of the tract she occupied in severalty, and that the said petition, and the decree of the court upon it, were not to affect her right. Which testimony, on being objected to, was overruled by the court.

The evidence being closed, the counsel for the defendants prayed the court to instruct the jury on the following points.

1. To entitle the plaintiffs to recover, on the ground that Mrs Sayre is a child and heir of John Ormsby, they must prove that there was an actual marriage between him and her mother.

2. That the statute of limitations does apply to tenants in common; and if the jury shall believe that the land in ques-

tion belonged to Jane Ormsby, and descended to Mary Sayre and the other heirs, yet the statute of limitations would be a bar to plaintiffs' recovery, if there was an actual adverse and continuous possession in the defendant, and those under whom she claims, for twenty-one years.

3. That if the jury shall believe the testimony of James Ross, John Hutchinson and George Kintzer, the facts sworn to by them, establish that kind of actual continuous and adverse possession, acknowledged by the courts, as coming up to, and fully within the statute of limitations. Several other points were made in the special prayer for instructions, but it is not important, now, to advert to them.

The court instructed the jury in substance, that the deeds from John Ormsby to the defendants, dated in the years 1804 and 1805, and which purported to convey the fee simple, in consideration of natural love and affection, did not transfer the fee, as Ormsby only had a life estate in the premises. "That the deed of the husband cannot pass his wife's lands, and no possession of the lands by the grantee, under the grant, can create a presumption of title, or become adverse to the true owner. An act or deed which is void, cannot be the foundation of an adverse possession, for it can give no colour of title ; and a void title is not such a conveyance as that a possession under it will be protected, under the statute of limitations. The conveyance of N. Bedford to Jane Ormsby, was indorsed on the deed from the Penns to N. Bedford ; and the conveyance by John Ormsby to Isaac and Sidney Gregg, recites the conveyance to Bedford. It must, therefore, be presumed, that John Ormsby had possession of the deed from the Penns to N. Bedford ; and that he at least was conusant of the title of the heirs of Jane Ormsby. The deeds to Isaac Gregg and to Sidney Gregg, set forth a conveyance from N. Bedford to John Ormsby ; such a conveyance, however, was never made ; and while that is admitted, the recital is attempted to be justified on other grounds. It is clear, that the deed from N. Bedford to Jane Ormsby, was withheld from the record by John Ormsby; and there is evidence enough to infer that it was suppressed by him, for, being in possession of the deed, he had power to direct it to be recorded. His omission to do so, his false recital of a deed to himself from N. Bedford for the same land, and

his concealment of the existence of any conveyance to Jane Ormsby, leave no doubt of his intention to suppress that conveyance. This conduct was fraudulent on the part of John Ormsby; and it is not material, whether Isaac Gregg and Sidney Gregg were parties to it or not, since no estate can be acquired by a fraudulent grant: covinous conveyance of land is as no conveyance, as against the interest intended to be defrauded. And it must follow, that no act or deed which is fraudulent, can be the foundation of an adverse possession; because, being absolutely void, and not merely voidable, it cannot afford colour of title, and without colour of title, there is nothing by which an adverse possession can be obtained; and for this reason. The statute of limitations does not extend to cases of fraud, and only begins to run from the time the fraud becomes known to the person then having the title. That all purchasers, for a valuable consideration, are affected with constructive notice of all that is apparent upon the face of the title deeds under which they claim.

"The right of Sidney Gregg, as one of the heirs of John Ormsby, if any she has as such, to the actual possession of the land, accrued after the death of John Ormsby, Jun. She may have then entered as one of the heirs of Jane Ormsby; and since that time, to the time of bringing this suit, has held, as she alleges, adversely to her co-tenants in common, and relies upon the statute of limitations to protect her in her claim. A possession to prevent a recovery, or vest a right, under the statute of limitations, must be actual, continued, adverse and exclusive : and it is a settled principle, that the doctrine of adverse possession is to be taken strictly, and not to be made out by inference, but by clear and positive proof. Every presumption is in favour of possession, in subordination to the title of the true owner; and whenever an adverse possession is relied on, there should be some proof of an actual ouster. The possession of one tenant in common, is prima facie the possession of his companion; and the possession of the one can never be considered as adverse to the title of the other, unless it be attended with circumstances demonstrative of an adverse intent. And if one tenant in common enters generally, without saying for whom, it will be implied, that he enters according to law; that is, for himself, and the other tenant or tenants. To re-

but this presumption of the law, an actual ouster must be proved; which, however, may be inferred from circumstances, of which the jury are to judge. They may presume an actual ouster, where one tenant in common enters on the whole, takes the profits and claims the whole exclusively, for twenty-one years. Under such circumstances, his possession becomes adverse, and the act of limitations begins to run. But a bare perception of profits by one tenant in common, is not an ouster of his co-tenant. The statute will not run where one holds as, tenant in common, during the minority of his co-tenant. That one tenant in common may oust his co-tenant, and hold in severalty, is not to be questioned. But a silent possession accompanied with no act which can amount to an ouster, or give notice to his co-tenant that his possession is adverse, ought not to be construed into an adverse possession. What facts constitute an ouster, and what adverse possession, must be determined by a jury. The party against whom the adverse possession is claimed cannot be concluded by it, if he labour under any of the disabilities pointed out in the statute; or where his co-tenaant claiming adversely, has been guilty of fraud, by concealing or suppressing the title.

" If Isaac Gregg entered upon the land adversely, fenced and occupied it exclusively, and that occupation has been uninterruptedly continued for twenty-one years, it would be available as a bar, although Isaac Gregg may have entered as a trespasser; but the acceptance of the deeds from John Ormsby in 1804 and 1805, although these deeds were void as to the inheritance, must lead to the conclusion, that he held under John Ormsby, Sen. The petition to the orphan's court for a partition of the land, in December 1828, supports this view of the case, and both acts show a disaffirmance of the title by settlement and improvement, if any existed."

The residue of the charge affirms principles, some of which are not controverted, and it need not be noticed.

This court have frequently remonstrated against the practice of spreading the charge of the judge at length upon the record, instead of the points excepted to, as productive of no good, but much inconvenience.

The principal question in this case, and, indeed, the only one of much importance, arises under the statute of limitations

By this statute, an adverse possession of twenty-one years, under a claim of title, will bar a recovery, though the occupant have no title.

Possession of the lots in controversy was taken by the defendants, in the court below, and is still continued, but the court instructed the jury that the acceptance of the deeds by Gregg and wife, from John Ormsby, Sen., in the years 1804 and 1805, was an abandonment of their prior claim by occupancy, and that they must be considered as holding under those deeds.

If it were necessary to a decision of this controversy, the correctness of this instruction might well be questioned. Ormsby had a life estate in the property, and it is not seen how the grantees of this estate abandon their title in fee, or any other claim, beyond that of a life estate, which they might have to the premises. But, as the decision of the case must turn upon another point, it is not necessary to examine this one.

It is true, as stated in the charge, that the husband cannot convey his wife's land so as to bind the inheritance. That as he holds only an estate for life in such land, he can convey no greater interest. But were the circumstances under which the deeds of 1804 and 1805, by John Ormsby to Gregg and wife, such as to make those deeds fraudulent, and wholly inoperative, under the statute of limitations? And was it immaterial whether Gregg and wife participated in this fraud of Ormsby, or had any knowledge of it, as expressly charged by the court?

It is an admitted principle, that a court of law has concurrent jurisdiction with a court of chancery, in cases of fraud. But when matters alleged to be fraudulent are investigated in a court of law, it is the province of a jury to find the facts, and determine their character, under the instruction of the court. Ormsby, in the opinion of the district court, was guilty of fraud, in not having the deed from N. Bedford to Jane Ormsby recorded, in reciting in his deeds to Gregg and wife, in 1804 and 1805, that a conveyance had been made to him by Bedford, when he knew that it had been made to Jane Ormsby his wife.

It would be difficult to assign any fraudulent motive to Ormsby, in either of the acts stated. The deed to his wife, from Bedford, was valid, though it was not recorded; and that he did not withhold it from the record with any view to his

personal advantage, is evident, from the fact of his having conveyed the property in consideration of natural affection, to the only surviving child of himself and the grantee.

In making these conveyances, on whom did he design to practise a fraud? Not on the grantees, for he received no other consideration from them than the impulse of fraternal attachment. Not on creditors, for it does not appear that they have been prejudiced. Did he design to defraud his granddaughter, who prosecuted the action of ejectment in the district court? There is no foundation in the facts and circumstances of the case for such an imputation.

Does the recital in these deeds that Bedford had conveyed to Ormsby, afford evidence of fraud? This recital may have been made, and, indeed, it would seem, under the circumstances, was, most probably, made through a mistake of the law. Bedford had conveyed to his wife Jane Ormsby, and he might suppose that a feme covert could not take an estate in fee, and that the conveyance enured to his benefit.

It appears, from the arguments of counsel, that this question was not considered entirely free from difficulty, under the laws of Pennsylvania, among some of the learned profession at that early day.

Fraud, it is said, will never be presumed, though it may be proved by circumstances. Now, where an act does not necessarily import fraud; where it has more likely been done through a good than a bad motive, fraud should never be presumed. But it is not necessary to decide whether these conveyances were fraudulently made by Ormsby, or not. The important point is, to know whether Gregg and wife had any knowledge of the fraud, if committed, or participated in it. This knowledge, the court charged the jury, was immaterial; as the fraud of Ormsby rendered the deeds void, and, consequently, they could give no colour of title to an adverse possession.

This instruction is clearly erroneous. If Ormsby be justly chargeable with fraud, yet if Gregg and wife did not participate in it; if when they received their deeds they had no knowledge of it, there can be no doubt that the deeds do give colour of title, under the statute of limitations.

Upon their face, the deeds purport to convey a title in fee;

and having been accepted in good faith by Gregg and wife, they show the nature and extent of their claim to the premises.

Ormsby could convey no greater interest in the land than he possessed ; but there is no evidence to show that the grantees in this case knew that his estate was limited, or that, in accepting the deeds, holding possession of the property, and improving it, they did not act in good faith. The possession which they hold under these deeds was adverse to Sayre and wife, and all other persons. The titles were for the whole property, and in fee ; consequently there can be no presumption that the possession was held as co-tenants with the plaintiffs, in the court below. Both the possession and the titles were exclusive ; and they were, consequently, adverse to all other claimants.

The eighth section of the statute fixes the limitation of twenty-one years as taking away the right of entry : and in the ninth section it is provided, " that if any person or persons having such right or title be, or shall be at the time such right or title first descended or accrued, within the age of twenty-one years, feme coverts ; then such person or persons, and the heir or heirs of such person or persons, shall and may, notwithstanding the said twenty-one years be expired, bring his or their action, or make his or their entry, &c. within ten years next after attaining full age," &c.

Mary Sayre, the defendant in error, was born in 1791, and she was twenty-one years of age in 1812. Her father having previously died, an interest in the property descended to her, on the decease of her grandmother, Jane Ormsby, in 1799.

The second deed, from Ormsby to Sidney Gregg, was made on the 13th of April 1805, the first one having been executed the year before. On the 13th of April 1826, the twenty-one years prescribed by statute expired, and the bar was complete at that time, if the possession had been uninterrupted, as more than ten years had run from the time Mary Sayre became of full age. The suit in the district court was not commenced until May 1830.

As this point decides the case, it is not necessary to examine other parts of the charge to the jury. For the reasons assigned, the judgment of the district court must be reversed.

This cause came on to be heard on the transcript of the record from the district court of the United States, for the western district of Pennsylvania, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this court, that the judgment of the said district court in this cause be, and the same is hereby reversed, and that this cause be, and the same is hereby remanded to the said district court, for further proceedings to be had therein, according to law and justice, and in conformity to the opinion of this court.